WALLING, Administrator of Wage and Hour Division, United States Department of Labor, v. CAREY CHAIR MFG. CO.

No. 76.

District Court, D. New Hampshire.

Jan. 19, 1943.

McLane, Davis & Carleton and Kenneth F. Graf, all of Manchester, N. H., and Roy M. Pickard, of Keene, N. H., for plaintiff.

Vernon C. Stoneman and Charles H. McCue, both of Boston, Mass., for Wage and Hour Division.

MORRIS, District Judge.

This is an application for adjudication in contempt brought by the Administrator of the Wage & Hour Division against The Carey Chair Manufacturing Company of Keene, New Hampshire praying that the Company and Forrest L. Carey, one of the officers of the Company, be adjudged in contempt.

The alleged action arises out of the claimed violation of the terms of a consent decree filed July 24, 1940, and entered into by the Government and the defendants.

The alleged violations are as follows:

1. That the defendants refused and failed to make restitution to their employees on the basis of payments required to be made under the overtime provisions and the minimum wage requirements of the Fair Labor Standards Act of 1938.

2. That the defendants paid many of their employees working in and about their plant and elsewhere wages at less than the minimum required by the Fair Labor Standards Act of 1938.

3. That the defendants failed to pay many of their employees working in and about their plant and elsewhere the overtime wages required by the Fair Labor Standards Act of 1938.

4. That the defendants failed to keep proper records of people employed by them in and about the plant as was required by Section 11(c) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 211(c).

5. That the defendants made and kept records that were inadequate, inaccurate and were in fact false and fraudulent.

On the same day, July 24, 1940, the parties entered into a stipulation whereby it was agreed that the defendant would pay each of its employees employed since October 24, 1938, a sum of money equal to the difference between the amounts of

wages actually paid each such employee for his employment during the said period and the amounts each such employee should have been paid had he been compensated for his said employment at the overtime rates of pay as required by the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

This stipulation was made a part of the injunctive order.

On April 2, 1942, a petition was filed praying that the defendant be adjudged in contempt for violations of the injunctive order. An order to show cause was issued against the Carey Chair Manufacturing Company and Forrest L. Carey.

There was a trial and much testimony was taken the transcript covering four hundred and twenty-one pages. On December 3, 1942, the matter was argued orally by counsel on both sides and written arguments submitted December 18, 1942.

It was admitted that the defendant had complied with the injunctive order in all particulars with respect to its eighty or ninety employees working in its factory.

The main contentions of the petitioner involves some eighteen home workers who were employed caning stool tops and chair backs. Prior to the effective date of the Fair Labor Standards Act of 1938, these home workers were receiving five cents each for finishing stool tops. This price prevailed until the first inspection of the Company in June, 1940, when the price was increased to fifteen cents for stool tops and eighteen cents for chair backs.

Gerald Clark who made the first inspection of the plant prior to the consent decree testified that he found the bookkeepers cooperative and admitted, as did the other inspectors, that the bookkeeper was told to turn over to them any and all books and records that the inspectors called for. The only complaint made by the inspectors is that certain old check books and certain old petty cash books were not delivered to them at the time of the examination.

It appears to be the position of the Government that these records would have disclosed additional information concerning the names and payment made to home workers. It appears that from October 30, 1939, all the names of home workers with their Social Security numbers, and the amount of pay received, were entered in the payroll book under the head of "domestic labor" which the inspectors had accessed to and examined in detail. This procedure of entering "domestic labor" weekly in the payroll books for the home workers carried through each and every week through June 22, 1940, at which time a new procedure was undertaken and the home workers' pay was no longer kept in the payroll book but kept separately. This change was made about the time of Clark's June, 1940, inspection which resulted in the use of home workers' hand books for the first time.

The Government inspectors should have recognized "domestic labor" as home work.

Clark testified that he told Carey of the violations he had found during the investigation and as a result of these there was restitution due the employees. Clark testified that the records for factory workers were adequate but there were no time records maintained for the piece workers in the factory and the same situation existed with reference to the home workers. He found only two piece workers in the factory. For the violations found he computed restitution in the sum of $494.04. This describes the situation up to the time the injunction was issued.

The second inspection was made by Francis Shaughnessy on or about September 26, 1940, who was sent into the plant to make a routine investigation in order to see whether or not the defendant had complied with the consent decree and to see why restitution had not been completed. Shaughnessy testified that he visited six home workers; that he watched their operations and gave as his opinion that they could not do two stool tops in an hour. He said he had had no experience in this type of work and such information as he got was obtained from the workers themselves. He said he told Carey that the hand books were not properly kept and that the Wage and Hour Division would regard such records as false. He asked Carey why he had not paid all that was due and Carey told him it was because he could not find all of the individuals. He pointed out to him that most of the people were living in town and some of the people were working in his factory at the time. Shaughnessy testified that he made some computations based on a twenty-cent rate which he left with the bookkeeper after dictating a letter which Carey signed agreeing to correct the Company's records; to compute the amount of restitution and to pay back wages due within ten days.

There appears to be considerable confusion as to Shaughnessy's testimony relating to this letter and whether his computations were based on a twenty-cent rate or on a basis, as he finally testified, that it would take forty-five minutes to do a single stool top. His computations as to time was based on what he was told by the home workers. On the whole Shaughnessy's testimony is confusing and carries very little weight.

The next inspection was made November 15, 1940, by John R. Ring. He testified that he talked with Carey and asked him why restitution had not been made in full. He said those who hadn't been paid were itinerant employees and could not be located. Carey gave Ring receipts for $300 from the first inspection and $18 from the second. Ring informed Carey that he was convinced that the prices paid for home work were not sufficient to permit the employees to earn the minimum wage and further that his investigation disclosed that the hours recorded in the home workers' hand books had been falsified. He testified further that he had visited some seventeen home workers and took written statement from some of them; made some observations regarding speed and found that the ordinary worker could finish a stool top in forty-five minutes although some could do it in forty and some it would take an hour and one said it could be done in thirty minutes. Only four home workers were called to testify.

Ring testified, as did inspector Clark, that he had never had any experience in caning or seating chairs, backs and tops. He said he gave the home workers no instructions as to keeping the hand books as it was not his business but that it made no difference who set down the figures as long as they were correct.

As a result of the inspections the Manchester office of the Wage and Hour Division computed that restitution should be made in the sum of $6,400.

Early in May, 1941, at the suggestion of inspector Clark, Carey accompanied by his counsel, visited the office of the Wage and Hour Division in Manchester for the purpose of discussing Carey's position on the restitution for home workers in the above amount, which was demanded after the consent decree had been made. Nothing was accomplished during this conference. A further conference followed in May, 1941, at the attorney's office in Manchester at which time production records for home workers were produced which had been compiled from the old petty cash books and old check books. The inspectors expressed a desire to examine the books themselves and they were later brought into the Manchester office and examined.

An inspector by the name of Henry H. Graham visited the plant September 29, 1941. He testified that he made time studies of the home workers and gave as his opinion that the average worker could do a stool top in forty minutes. He said he found the records of the home workers inaccurate in respect that the number of hours showed on the books did not truly represent the number of hours worked. He said he found other violations of a minor nature. He testified that an interview with the bookkeeper disclosed that she ordinarily worked thirty-nine hours but one week she worked one and one half hours in excess of that and had received no over-time compensation. There was another instance the case of an employee of the factory whose wife took out home work and the husband after going home at night would assist his wife in finishing the stool tops and chair backs. The inspector said there was no record of that man's time spent in his house, therefore, in each week where the employee worked forty hours and did any home work at all, where he was assisting his wife, he was in violation of Section 7 of the Wage and Hour Division of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 207. Graham said he was an expert on home work but did not know anything about the chair business, in fact he did not know the difference between cane and rattan and his information as to the time it took to do a stool top came from the home workers themselves. He said the only way an employer could control home work was to abolish it and the fact that home work cannot be controlled would cause him to look with suspicion on any home work that was done and the hours submitted.

Mr. and Mrs. Wesley Castor and Ella M. Carey each testified that it took them forty-five minutes to finish a stool top and that they could not do two an hour to permit them to earn the minimum wage of thirty cents an hour. Their testimony is not entirely convincing because it appears that the Castors were at one time given a considerable amount of work on a hurried job and finished two hundred stool tops in one

hundred and one hours. In this instance they kept their time accurately. All the witnesses testified that when they told Carey they were not getting enough pay for their work and that they could not do two stool tops an hour the work was taken away from them. Time books, were furnished the home workers in which they were supposed to keep a record of their time but none of them appear to have done so. The books were in the hands of the workers and were presented at the office when they went there for their pay. They testified, and I find as a fact, that to determine the number of hours worked the bookkeeper divided the number of pieces returned by two. The Company claimed that two stool tops an hour could be finished basing its computation on time studies made in the factory. As a matter of fact I do not suppose that any one of the home workers could tell even approximately how much time was spent on a stool top. It is easy to understand how a housewife, with her manifold duties would sit down and work a few minutes and then attend to other duties without keeping any actual account of her time.

The only other home worker who testified was Mrs. Mabel Castor, a woman 74 years of age who told Carey that it took her one hour to do a stool top. Her name did not appear on the records of the Company. It did appear that her husband received the work and she worked with him at home. When she told Mr. Carey that she could not do but one stool top an hour he told her she couldn't have any more work. The following spring the husband of Mrs. Castor was given a little more work in order to obtain the small amount of money he lacked in order to obtain the old age relief.

This transaction does not impress me as testimony upon which I should adjudge the Company or Mr. Carey in contempt for violating an injunction. It is too small a matter to dwell upon. This is one of the minor offenses mentioned in Inspector Graham's testimony.

Phyllis Langis testified that she was a bookkeeper in the plant in 1941 and at that time there was very little home work being done. She said that in order to obtain the number of hours worked she divided the total earned by thirty-cents, the minimum wage rate. At the time of Graham's inspection there were only four home workers employed and they were told that

they must insert their hours in the hand-books which they did.

Forrest L. Carey, owner and superintendent of the factory testified that he made time studies which were necessary in the conduct of his business and that employees were timed on both stool tops and chair backs. He testified to conversations with the inspectors and told his office force to give them whatever they asked for. He said he left his office business to his bookkeeper and knew very little about the detail.

Mrs. Dorothy M. Barnard who had been a bookkeeper in the plant, but was not working there at the time of Clark's inspection, was called in by Mr. Carey to assist Clark in his investigation as the present bookkeeper, Carol S. Roder, was inexperienced. She corroborated Mr. Carey's testimony that she was told to give the inspector everything he required to assist him and says that she did so. The testimony of Carol S. Roder who was the bookkeeper in the factory was to the same effect when Shaughnessy and Ring inspected the plant.

Joseph LaBounty a witness called by the defendant testified that he had worked in the factory seating chairs but had not worked on stool tops for the past six or seven years. He was timed on doing a stool top which was produced as an exhibit in court. He said he had watched the various home workers and they could do a stool top apparently as fast as he could.

It appears that at one time the Carey Chair Company employed a number of woodsmen cleaning up hurricane lumber. During some one of the first inspections it appeared that some of them were not paid for over-time work and the computation of $494.04 which was the restitution to be made at the time the consent decree was signed included some of such wages. Mr. Carey's excuse for not paying all the woodsmen was that some of them could not be found. I find that there were wages due to persons, other than woodsmen, living in and about Keene who had not been paid. This was testified to by one of the inspectors and not denied by Carey.

The plaintiff argues that the home workers' hand-books were inaccurately kept because the true number of hours was not inserted. An inspection of the home workers' hand book shows eleven columns to be filled out by the home worker, each column requiring different information. If a book was fully and properly kept it would

require much time and in my opinion be very difficult for the average worker. It was brought out in the testimony that it was the employer's business to see that these books were properly kept but it would be an impossibility for an employer to fill out the hand-books except on information from the home worker.

To obtain the number of hours worked the number of stool tops returned was divided by two and the quotient set down as the true number of hours worked. If the workers could do two stool tops an hour this would be correct. This method is considered incorrect by the inspectors because they have made a somewhat arbitrary finding that it takes forty-five minutes to do one stool top and if the books had been kept on that basis it would have been satisfactory to the Wage and Hour Division. The defendant's method does not differ from the inspector's method except that they differ as to the time it takes to do a stool top. It is the difference between thirty minutes and forty-five minutes. Neither method reflects the true time consumed by a home worker. It is argued that the defendant's method is false and would be regarded as such by the Wage and Hour Division. If this method is false the plaintiff's method is likewise false.

It was admitted that workers in the factory doing piece work could earn the minimum wage. It appears that the inspectors were trying to establish a different rate for home workers than that paid to the factory workers. The defendants contended that their time studies showed that the minimum rate could be earned by finishing two stool tops an hour. The inspectors determined that to finish one stool top required forty-five minutes and herein lies the principal contention between the Company and the Wage and Hour Division with reference to prices paid and the basis upon which it is claimed that the Company should make restitution in the amount of $6,400 to its home workers. Overtime did not enter into this computation of $6,400.

### Conclusions of Fact.

I find that the petition that the defendants be adjudged in contempt was filed April 2, 1942.

I find that although the injunctive decree does not name the exact amount of restitution the understanding was that it should be in the amount of $494.04 and if this had been paid I would find no violation of the order because larger amounts were demanded later.

I find that the evidence of failure to pay the minimum wage is confined entirely to wages paid to home workers.

I find that the evidence relative to the length of time required for caning stool tops and chair backs is so conflicting that the Court is left in doubt. The main difficulty arises from the fact that the parties, both plaintiff and defendants, attempt to reduce all home workers, whether skilled or unskilled, to a common denominator and ask the Court to find the time required by all individuals to finish a stool top to be the same. The minimum wage prevailing at the time was thirty-cents an hour. The rate of payment for stool tops was fifteen cents each. There was not much testimony introduced concerning chair backs.

I find that the testimony is left somewhat in doubt by the fact that the witnesses, if they established their case, would be beneficiaries, to a considerable sum of money.

I find that none of the inspectors were familiar with the type of business involved and that their conclusions were largely obtained from what the home workers told them.

I find that the inspectors adopted the claim, made by the witnesses, that it took forty-five minutes to finish one stool top and made all their computations on that basis.

I find that the testimony is not sufficiently convincing upon which to base a judgment of contempt on this point.

I find that the lumbering operations of the Carey Chair Manufacturing Company cover a period of some thirty-five years. Much of the work was done by subcontractors who hired and paid their own men except in rare cases where it was necessary for Mr. Carey to pay the choppers owing to the fact that the contractor was not reliable. As the testimony fails to segregate choppers who worked for sub-contractors from those who were directly in the employ of the defendant, if any, there is nothing on which the Court can base any conclusions.

I find that the home workers never attempted to fill out their time books but that the Company's bookkeeper filled in the number of hours worked on the basis that thirty minutes was required to finish one stool top.

I find that the books and records of the Company were not kept so as to show all the information required by Section 11(c) of the Act with respect to home workers.

I find that Mr. Carey was not familiar with his bookkeeping system and that Mrs. Roder, inexperienced as she was, did not appreciate and produce the old petty cash book and the old bank stubs which were in use prior to her employment. They were produced later at a conference in the Manchester office.

I find that the inspectors had sufficient records, before the old petty cash book and the old bank stubs were produced, so that they computed back pay to employees in the sum of $6,400.

I find that the matter of over-time seems to be entirely dependent upon the fact that if a stool top could be finished in thirty minutes there was no over-time but if it took forty-five minutes there was over-time. Time studies made at the factory and by an employee tended to establish the former which I find as likely to be correct as the testimony of only four out of eighteen employees.

I find that when the injunctive order was granted by consent of the parties, it was understood that restitution would be made to the employees in the sum of $494.04. When at a later date $6,400 was demanded it raised a new issue that was not considered or anticipated when the consent decree was signed.

I find from the undisputed testimony that some of the employees who had not been paid were residents of Keene and it was Mr. Carey's duty to locate these people in an attempt to perform the terms of the decree but he seems to have been indifferent, when he should have been diligent.

## Conclusions of Law.

A question arises as to whether or not this proceeding is in the nature of a criminal or a civil contempt.

■ The distinction between a civil and a criminal contempt is: "Contempts of court for which punishment is inflicted for the primary purpose of vindicating public authority are denominated criminal, while those in which the enforcement of civil rights and remedies is the ultimate object of the punishment are denominated civil contempts."

■ I hold that this proceeding is in the nature of a criminal contempt and while I do not go so far as counsel argued and hold that the evidence must satisfy the Court beyond a reasonable doubt, I do hold that if the evidence is so conflicting as to leave the mind of the Court in an uncertain and unsatisfactory condition that the accused must be given the benefit of the doubt.

■ The allegations in complaint No. 1 are established, and the defendants are found to be in violation of the injunctive order.

■ The allegations in Complaint No. 2 are not established.

■ The allegations in Complaint No. 3 are not established.

■ The allegations in Complaint No. 4 are not established, as they refer to persons working in and about the plant.

■ The allegations in Complaint No. 5 are established only to the extent that the records were inaccurate and inadequate in so far as they pertain to the home workers.

Arguments of counsel are requested as to the final disposition of the case and as to what order or orders should be made against the defendants that they may be given an opportunity to purge themselves of the contempt.